# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ADMINTERMARE, A DIVISION OF ADM INTERNATIONAL, SARL, | § § § | |
| Plaintiff, | § § § | C. A. No.:  4:19-cv-02238 |
| V. | § § | Admiralty 9(h) |
| KAMCA TRADING SA and GLENCORE LTD., | § § § | |
| Defendants. | § | |

DECLARATION OF JOSÉ IGNACIO ARBELÁEZ MONTOYA
IN SUPPORT OF KAMCA TRADING SA'S OPPOSITION TO
ADMINTERMARE'S MOTION TO TRANSFER VENUE

I, José Ignacio Arbeláez Montoya, declare as follows:

1.      I am director for Kamca Trading SA ("Kamca") and work at Kamca's principal place of business at Rue des Pilettes 1, Fribourg, 1700, Switzerland.  I submit this Declaration in support of Kamca's response to ADMIntermare's ("ADM") motion to transfer venue in the above-referenced action.  I make this Declaration of my own personal knowledge and, if called to do so, could testify competently to the facts stated hereinunder oath.

2.      Kamca sold bunkers to ADM on eleven separate occasions during the period January 2017 to June 2018, all of which were specifically subject to Kamca's General Terms and Conditions: "Delivery Conditions:  As per Kamca general terms and conditions, unless otherwise agree with Buyer [ADM] in writing on a *first come first served basis*."  A true and

correct copy of a representative sample of the Notice of Confirmation of the bunker sale to ADM is attached as Exhibit 1.

3.      Attached as Exhibit 2 is a true and correct copy of a letter, dated August 15, 2018, by which Kamca had forwarded a copy of its General Terms and Conditions of Sale to ADM's attorneys, specifically in response to their formal communication of "Notice of Claims" on behalf of ADM dated August 13, 2018.

4.      Attached as Exhibit 3 is a true and correct copy of a letter, dated July 8, 2019, from Sturzenegger & Co. LLC to ADM's attorneys expressing referring to the SDNY provision in its terms of sale.

5.      Attached as Exhibit 4 is a true and correct copy of an email, dated August 7, 2019, from ADM's attorneys responding to Exhibit 3 above.

6.      Attached as Exhibit 5 is a true and correct copy of a letter, dated September 28, 2019, from Sturzenegger & Co. LLC to ADM's attorneys contesting the filing of this lawsuit in a forum other than the contractual one, *i.e.*, the SDNY.

I declare under penalty of perjury under the laws of the United States that the foregoing facts are true and correct.

Executed on December 4, 2019
            Fribourg, Switzerland

_____
            José Ignacio Arbeláez Montoya

- 2 -

# EXHIBIT 1

**Marc Sturzenegger**

**To:** Juan K; Ramon
**Subject:** RE: Bunker Confirmation - Clipper Amsterdam

---------- Forwarded message ----------
From: **Tasos Anastasoulis <tasos@kamcapetrol.com>**
Date: Fri, Jul 14, 2017 at 8:31 PM
Subject: Bunker Confirmation - Clipper Amsterdam
To: PANTHERA ENERGY <energy@pantheraenergy.com>

Messrs.: Panthera Energy

Attention: Mr. Henning Pommer

Dear Henning,

Thank you for your nomination, we are pleased to confirm as follows:

| | | |
|---|---|---|
| Buyer: | M/V Clipper Amsterdam and jointly and severally the master and/or owners and/or disponent owners and/or charterers and/or agents and/or ADM International | |
| Seller: | Kamca | |
| Physical Supplier: | Kamca | |
| Vessel's Name: | Clipper Amsterdam | |
| IMO Number: | 9713480 | |
| Port of Delivery: | Balboa | |
| Delivery Date: | 22nd - 23rd July 2017 | |
| Grade(s): | Fuel Oil 380 cSt | Low Sulfur Marine Gasoil |
| Specification(s): | As per ISO8217:2010 | |
| Designation(s): | RMG380 | DMA max 0.1% s |
| Quantity: | 525 - 625 mts | 50 - 125 mts |
| Price(s): | USD 297.00 /mtw | USD 489.00 /mtw |
| Agents: | please advise | |
| Extra charges: | a) First 500 metric tons USD 8,500.00 lump sum | |
| | b) Above 500 metric tons USD 3.60 per metric ton | |
| | c) Fuel oil surcharge USD 750.00 lump sum | |
| | d) Pollution fee USD 0.05 per barrel | |
| | e) Pipeline fee USD 0.50 per barrel, minimum USD 750.00 | |
| | f)  Overtime USD 250.00 lump sum, if incurred | |
| | g) Any extra charges for buyer's account, if incurred | |
| Delivery Conditions: | As per Kamca general terms and conditions, unless otherwise agreed with Buyer in writing, on a *first come first served* basis. | |
| Payment Terms: | Irrevocable payment shall be made by Buyer in full basis thirty (30) days after delivery date, in full without discount, reduction, counterclaim or set off and free of bank charges to Kamca's bank account. Should the due date for payment fall on a Saturday, Sunday or Holiday, then payment should be received by the previous working day. | |
| | a. USD 1.00 /mt on behalf or Panthera Energy and | |
| | b. USD 2.00 /mt on behalf of Merlin Petroleum | |

Commission:

The above confirmation is placed in accordance to our general terms and conditions a copy of which is at your disposal otherwise please advise.

We thank you for concluding this business through us.

--
Best regards

# EXHIBIT 2

**Kirk M. Lyons**

| | |
|---|---|
| **Subject:** | FW: FW: Notice of Claim, ADM and M/V SFL Yukon [HFWHOU-HOUIMAN.FID27706] |
| **Attachments:** | Letter to Holman (ADM).pdf; GTC BUNKERING KAMCA .pdf |

---------- Forwarded message ---------
From: **Marcos** <marcos@kamcapetrol.com>
Date: Wed, Aug 15, 2018 at 9:56 AM
Subject: Re: FW: Notice of Claim, ADM and M/V SFL Yukon [HFWHOU-HOUIMAN.FID27706]
To: Chris Hart <chris.hart@hfw.com>, Jerry Kimmitt <jerry.kimmitt@hfw.com>, <gerhard.kraft@adm.com>, <jonathan.athnos@adm.com>, Bunkers Account <bunkers@merlinpetroleum.com>
Cc: Henning Pommer <henning@pantheraenergy.com>, mikolaj@kamcapetrol.com <mikolaj@kamcapetrol.com>, Tasos Anastasoulis <tasos@kamcapetrol.com>, Vanessa Teresa Mazza Zaldivar <management@kamcapetrol.com>, Ramon . <ramon@kamcapetrol.com>, Juan K <juan@kamcapetrol.com>


Dear All,

We refer to your email below of 13th August, 2018 and have attached Kamca letter in response.

Best regards

```
Marcos Marx
Chief Operating Officer

Kamca Trading
Ph:  +41 26 301-4002
Mob: +41 79 369-4494
ICE: mmarx
Marcos@kamcapetrol.com
www.kamcatrading.com


This email (including price reference and/or terms and conditions
related to the proposed transaction) does not constitute a binding
agreement or obligation to reach a definitive agreement with respect
to the proposed transaction, and no contract or agreement, even
partial, shall be deemed to exist unless and until the definitive
agreement is executed and delivered by the parties involved.

No Kamca Trading SA employee, agent, broker and /or trader is
authorized to conclude any binding agreement on behalf of Kamca
Trading SA with another party without express written confirmation
by two Kamca Trading SA authorized directors.
```
On 13/08/2018 8:08 PM, Bunkers wrote:

Marcos/Terri

See attached I don't see you were on the list

Talk soon

Rgds

---

**From:** Chris Hart <chris.hart@hfw.com>
**Sent:** Monday, August 13, 2018 1:53 PM
**To:** info@kamcapetrol.com; juan@kamcapetrol.com;
ramon@kamcapetrol.com; management@kamcapetrol.com;
tasos@kamcapetrol.com; mikolaj@kamcapetrol.com;
henning@pantheraenergy.com
**Cc:** bunkers@merlinpetroleum.com; jonathan.athnos@adm.com;
gerhard.kraft@adm.com; Jerry Kimmitt <jerry.kimmitt@hfw.com>
**Subject:** Notice of Claim, ADM and M/V SFL Yukon [HFWHOU-
HOUIMAN.FID27706]

Dear All:

We represent Archer Daniels Midland Company in a claim
against Kamca Trading S.A.  Attached is a letter providing
notice of claim for defective bunkers delivered to M/V SFL
YUKON at Balboa, Panama on or about 22 June 2018.

We request that you reply to acknowledge receipt of this notice
of claim, and we look forward to hearing from you regarding this
matter.

Kind regards
Chris Hart
Of Counsel
**HFW**

**D**  +1 (713) 706 1958 (internal ext 5146)

2

**E**  chris.hart@hfw.com

HFW, 5151 San Felipe, Suite 400, Houston, Texas 77056, USA
**T**  +1 (713) 917 0888  |  **F**  +1 (713) 953 9470  |  **hfw.com**

HFW is Holman Fenwick Willan USA LLP, which is a limited liability partnership registered in England and Wales (with registered number OC412721) and is authorised and regulated by the Solicitors Regulation Authority, with registered number 632257. A list of members' names is open to inspection at the registered office, Friary Court, 65 Crutched Friars, London EC3N 2AE.

This e-mail (including all attachments) is intended for the named addressee. It is confidential and may be privileged. If you have received it in error, please contact us immediately and then delete it. You should not disclose its contents to any other person. For more information on how we may process your personal data, please read our Privacy Notice.

**Our bank account details are in our client care letters and will not change. Please do not reply to or act upon any email you receive purporting to advise you that our bank account details have changed. If you receive any such communication, please telephone us and speak to your contact at our office. We will also require independent verification of changes to any account to which we are asked to send money.**

This message has been scanned for viruses by Mimecast.

**Beirut  Brussels  Dubai  Geneva  Hong Kong  Houston  Jakarta  Kuwait  London  Melbourne  Paris  Perth  Piraeus  Riyadh  São Paulo  Shanghai  Singapore  Sydney**

Please consider your environmental responsibility before printing this email.

 Virus-free. www.avast.com



Mr Gerard Kimmitt,
Holman Fenwick Willan USA LLP
5151 San Felipe, Suite 400
Houston, Texas 77056

By email: jerry.kimmitt@hfw.com

15 August 2018

Dear Mr Kimmitt,

**M/V "*SFL Yukon*" - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018**

We acknowledge receipt of the "Notice of Claim" dated 13 August 2018 issued by your firm on behalf of Archer Daniels Midland Company. We confirm that our company sold and delivered IFO bunker of RMG 380 grade to your client at Balboa anchorage on 21-22 June 2018 in a total quantity of 979.87 mt.

We were first advised by email on 19 July 2018 by the bunker broker involved, Merlin Petroleum Co Inc, of reports from the vessel of problems experienced by two fuel pumps on the vessel. By email on 20 July 2018 the broker sent us a fuel analysis operation report dated 27 June 2018 that reported a "*specification comparison*" for the sample tested against "*amended ISO 8217:2005 specification for RMG 380*" that they attributed to the product supplied by us on 22 June 2018. This report concluded that, "*Based on this sample the specification is met*".

Subsequent to this, we received via the same broking channel by email on 7 August 2018 another analysis report dated 30 July 2018 issued to a company called Bernhard Schulte Shipmanagement (Singapore) Pte Ltd pertaining to a sample of bunkers with a different date of 22 July 2018, which recited that there was no seal data, and which concluded by reference to the reporter's attributed specification "*ISO 8217:2010 (E)*" that the specification was not met by the sample tested.

Finally, we now have your formal "Notice of Claim" dated 13 August 2018 that does not refer to any report of testing or results, and acknowledges that you do not have any.

In the circumstances, we are unable to accept your speculative view that the product delivered by us to your client was "*defective, off-specification, contaminated, and inadequate*", and which omits reference to any specification.

Moreover, whatever the case, it is clear that your "Notice of Claim" has been communicated out of time pursuant to our General Terms and Conditions (copy attached for easy reference) of Sale (clause 10.3), which provides for a notice period for quality claims of 21 days from the date of delivery, and this would, therefore, also be the case in respect of any of the emails referred to above whatever their character and significance may be.



Accordingly, we disclaim liability for any claim by your client arising from the supply of this product on 22 June 2018.

It goes without saying that this is all more so in the case of the exaggerated class of other persons claimed against in the person of, "*our parent, subsidiary, or affiliates*".

Further correspondence in the matter (if any) should be directed to the undersigned, whom you omitted from your distribution of 13 August 2018.

Yours faithfully,
**KAMCA TRADING SA**

By: Marcos Marx
Title: Chief Operating Officer

KAMCA Trading SA, Rue des Pilettes 1, 1700 Fribourg-Switzerland
Phone no. +41 26 321-2009     info@kamcapetrol.com

**KAMCA TRADING**

**General Terms and Conditions of Sale**

These General Terms and Conditions of Sale ("GTCs") are the terms and conditions under which Kamca Trading SA and any affiliated companies ("Seller") agree with Buyer to provide Buyer and the Vessel with Marine Fuel (the "Contract"). These GTCs shall apply to all deliveries contracted, unless Seller expressly confirms otherwise in the Confirmation. Each delivery shall constitute a separate contract.

## 1. DEFINITIONS

Throughout this Contract, except where the context otherwise requires, the following definitions shall be applied:

1.1. "Banking Day" shall mean a day on which banks are open in the places of business of Seller and Buyer and, where a remittance is in United States dollars, in New York or, if other than United States dollars, in the country of the price currency.

1.2. "BDN" means Bunker Delivery Note or Bunker Delivery Receipt.

1.3. "Bunker Tanker" means bunker barge or tanker or tank truck supplying Marine Fuel to the Vessel.

1.4. "Buyer" means the party contracting to purchase, take delivery and pay for the Marine Fuel and includes the Vessel; the Vessel's owners, managers, and operators; and any Trader, Intermediate Buyer, or other entity collectively or individually agreeing to purchase, take delivery, and/or pay for the Marine Fuel.

1.5. "Confirmation" means Seller's written confirmation.

1.6. "Contract" means this contract of sale and delivery of Marine Fuel between Seller and Buyer and the Vessel, all subject to the GTCs.

1.7. "Day/Days" means a calendar day(s), unless otherwise stated.

1.8. "Delivery" means Seller's provision of Marine Fuel to Buyer and/or the Vessel.

1.9. "Due Date" means the date specified in the Confirmation for payment of the Price and any and all other fees, costs, charges and like items.

1.10. "Intermediate Buyer" means any Buyer selling the Marine Fuel to any entity other than the Ultimate Purchaser.

1.11. "Marine Fuel" means marine fuels, derived from crude oil, delivered or to be delivered to the Vessel as stated in the Confirmation.

1.12. "Parties" means Seller and Buyer collectively.

1.13. "Party" means Seller or Buyer.

1.14. "Physical Supplier" means the entity physically providing the Marine Fuel to the Vessel together with that entity's servants, agents, successors, subcontractors and assigns. The Physical Supplier may be Seller or any other entity.

1.15.   "Place of Supply" means the port or other readily identifiable geographical area specified in the Confirmation wherein or adjacent to which is the Point of Delivery.

1.16.   "Point of Delivery" means the precise place at which provision to the Vessel is to be effected as provided in the Confirmation or as thereafter confirmed, advised or revised by Seller or Physical Supplier being a berth, mooring, anchorage or other point within, adjacent to or associated with the Place of Supply.

1.17.   "Price" means the price as set forth in the Confirmation and subject to the GTCs.

1.18.   "Risk" means responsibility for and prevention and avoidance of loss, damage, liability, charges, fines, taxes and/or assessments.

1.19.   "Seller" means the party contracting to sell and deliver the Marine Fuel.

1.20.   "Trader" means any entity, other than Seller, which sells the Marine Fuel to any Buyer.

1.21.   "Ultimate Purchaser" means the entity, including any Buyer, operating, managing and/or controlling the Vessel which receives the Marine Fuel, as well as the Vessel itself.

1.22.   "Vessel" means the vessel nominated by Buyer to receive the Marine Fuel.

Unless the context otherwise requires, all references in the GTCs to the singular shall be deemed to include the plural and vice versa.

The use of headings and explanatory notes is for convenience and elucidation only. They are not part of the GTCs.

## 2.   BROKERS / AGENTS

2.1.   Unless the party with whom Seller is corresponding specifically declares to Seller prior to Seller's issuing the Confirmation that the party with whom Seller is corresponding is not Buyer and at the same time provides to Seller the full name and address of Buyer, then the party with whom Seller is corresponding shall be deemed to be Buyer.

2.2.   Without prejudice to the provisions of Clause 2.1, in the event that the party with whom Seller is corresponding is an agent of Buyer then the party with whom Seller is corresponding shall be jointly and severally liable with Buyer to perform Buyer's obligations under the Contract, notwithstanding that the party with whom Seller is corresponding purports to be as a mere agent.

## 3.   QUALITY / GRADES

3.1.   Buyer shall have the sole responsibility for the nomination of the grades of Marine Fuel fit for use by the Vessel.

3.2.   Seller may discharge its obligation to deliver the Marine Fuel as specified in the Confirmation by supplying in substitution thereof Marine Fuel of a different grade and/or brand name, provided that in the sole opinion of Seller such substitute Marine Fuel is of an equivalent or superior specification to that specified in the Confirmation.

**4.      QUANTITY / MEASUREMENTS**

4.1.      Subject to the other terms of the Contract, the quantities of Marine Fuel delivered shall be determined from the official gauge or manual sounding or meter of the Bunker Tanker effecting delivery, or in case of delivery ex-wharf, of the shore- meter or like equipment.

4.2.      The Marine Fuel to be delivered shall be one of Seller's commercial grades of Marine Fuel as currently offered generally at the time and Point of Delivery. **NO WARRANTIES, EXPRESS OR IMPLIED, AS TO QUALITY OR FITNESS FOR ANY PURPOSE ARE GIVEN OR FORM PART OF THE CONTRACT**. Buyer acknowledges and warrants that it is Buyer's responsibility to test the Marine Fuel delivered and to ensure that it is proper in all respects prior to use of such Marine Fuel on the Vessel.

4.3.      Responsibility for establishing compatibility of the Marine Fuel delivered with any other marine fuel and for segregating or co-mingling the same rests solely with Buyer, it being understood however that incompatibility of the Marine Fuel with existing marine fuel on the Vessel is not a ground for rejection of the Marine Fuel by Buyer.

4.4.      For any claims related to quantity, the measurements provided by the Bunker Tanker shall be final, controlling, and binding.

**5.      SAMPLING**

5.1.      Buyer or its representative may witness the sampling of the Marine Fuel. During bunkering, a primary sample shall be drawn at a point determined by Seller closest to the Vessel's bunker manifold and otherwise in accordance with the procedures set out in IMO Resolution MEPC.182(59) Guidelines for the Sampling of Fuel Oil for Determination of Compliance with MARPOL 73/78 Annex VI or any subsequent amendments thereto. Each sample shall be thoroughly mixed and carefully divided into a minimum of four (4) identical samples and Buyer shall retain at least one sample of each grade of the Marine Fuel on board the Vessel for MARPOL purposes. The absence of Buyer or its representative shall not prejudice the validity of the samples taken. Mandatory local bunkering rules and regulations shall take precedence over the immediately previous provisions.

5.2.      The samples referred to in Clause 5.1 shall be securely sealed and provided with labels showing the Vessel's name, identity of delivery facility, Marine Fuel name, delivery date, and place and point of sampling and seal number, authenticated with the Vessel's stamp and signed by Seller's representative and the Master of the Vessel or the Master's authorized representative.

5.3.      Two (2) samples may be retained by Buyer. Seller shall maintain the other two (2) samples on board the Vessel (one of which shall be for MARPOL purposes).

5.4.      If the quantity is delivered by more than one Bunker Tanker, the sampling procedure shall be repeated as outlined in this Clause 5 for each Bunker Tanker's delivery.

**6.      DELIVERY**

6.1.   Delivery of the Marine Fuel shall be made day and night, Sundays and holidays included, at the Point of Delivery, subject always to the customs of the Point of Delivery. Seller only guarantees to effect deliveries on a first come, first served basis, in accordance with Seller's supply schedule and in coordination with the Vessel's agent and/or representative.

6.2.   If Seller at any time or for any reason believes that there may be a shortage of Marine Fuel at the Place of Supply, Seller in its absolute sole discretion may allocate among Buyer and others its available and anticipated supply of Marine Fuel in such a manner as Seller solely determines. In such allocation, Buyer shall accept the allocated Marine Fuel and the Confirmation shall be amended accordingly.

6.3.   Seller shall not be required to deliver Marine Fuel into any of the Vessel's tanks or other places that are not regularly used for storage of bunkers or lubricants or other marine fuel as the case may be and shall not be required to deliver any Marine Fuel the export of which requires a government permit which permit has not been obtained.

6.4.   Delivery may be accomplished in one or more consignments at the Point of Delivery by such means as Seller solely may deem appropriate.

6.5.   Buyer shall, at the time the order is placed, designate a date or range of dates for delivery of the Marine Fuel, which dates will be confirmed in the Confirmation.

6.5.1.   In the event the Vessel arrives earlier than 48 hours prior to the agreed date or range of dates or later than 48 hours after the agreed date or range of dates, Seller reserves the right to adjust the price to reflect any increase in the relevant Platts publications, which may be obtained from Seller upon request.

6.5.2.   Should Buyer elect to cancel the order after Seller has issued the Confirmation, Buyer shall pay a cancellation fee equal to 5% of the order price. Clause 6.5.2 does not apply where Buyer cancels subject to the provisions of Clause 8.1.

6.6.   Buyer shall give Seller 96 hours and 72 hours approximate notice, and 48 hours and 24 hours definite notice, of the Vessel's arrival and the location and time at which delivery is required.

6.7.   Buyer shall notify Seller about the progress of the Vessel while transiting the Panama Canal, and will advise of any changes, delays, or problems that the Vessel encounters during the passage and transit.

6.8.   Buyer shall, at its own expense, provide a clear and safe berth for the Bunker Tanker alongside the Vessel and shall provide all necessary equipment, facilities, personnel, and assistance required to effect provision of the Marine Fuel to the Vessel. Buyer shall make all connections and disconnections between the pipelines or delivery hoses and the Vessel's intake line and shall render all other necessary assistance and provide sufficient tankage and equipment to receive promptly each and every consignment of the Marine Fuel. Buyer is responsible for ensuring that the Marine Fuel is delivered at a safe rate and pressure and that all equipment

utilized therefore is in a safe and satisfactory condition. Buyer agrees to pay and indemnify Seller against all claims and expenses in respect to any actual or alleged loss, damage, or delay caused by the Vessel to any Bunker Tanker.

6.9. Charges for such Bunker Tanker are for Buyer's account and included in the Price. Buyer will pay as part of the Price for the provision by Bunker Tanker in accordance with the rates and charges of the Bunker Tanker operator, owner, or manager. Buyer understands that provisions of different types or grades of Marine Fuel may necessitate the use of two or more Bunker Tankers and will be subject to separate charges.

6.10. Seller shall have no responsibility for detention or demurrage incurred by Buyer or the Vessel caused by delays in the Bunker Tanker arriving on station due to bad weather or bad visibility. Bad weather and bad visibility may be determined based on local weather reports and in any event such determination is within the Bunker Tanker's sole discretion.

6.11. In any case due to any delays or detention of the Vessel, Seller may exercise its right to cancel the Delivery without releasing Buyer from liability for all and any costs that may arise as a result of such delay.

6.12. Buyer shall ensure that the Vessel is in possession of all permits and/or certificates required to comply with all relevant regulations pertaining to delivery of the Marine Fuel at the Point of Delivery.

6.13. The Master of the Vessel shall:

6.13.1. advise Seller in writing, prior to delivery, of the maximum allowable pumping rate and pressure and agree on communication and emergency shut-down procedures;

6.13.2. notify Seller in writing, prior to delivery, of any special conditions, difficulties, peculiarities, deficiencies or defects in respect of and particular to the Vessel which might adversely affect the delivery of the Marine Fuel; and,

6.13.3. provide a free side to receive the Marine Fuel and render all necessary assistance which may reasonably be required to moor or unmoor the Bunker Tanker, as applicable.

6.14. The Master of the Vessel shall complete and execute the documents titled "Key Meeting" and "Invitation Letter" and return both to Seller as soon as the Delivery has concluded.

6.15. If the Master or his representative declines to board the Bunker Tanker before and/or after the Delivery, the master of the Bunker Tanker will issue a protest letter which the Master of the Vessel shall sign and any claim concerning quantity shall be void and automatically declined.

## 7. DOCUMENTATION

7.1. Before commencement of delivery, Seller shall, without obligation, endeavor to present a bunker requisition form or similar document, duly signed by Seller, which

shall contain the quantities to be delivered and all information required, in accordance with the Confirmation or any subsequent amendments thereof, including, in particular, the values for: viscosity; density; sulfur content; and flash point. In addition, and if available, similar information may be provided for vanadium, ash content, water content, and pour point.

7.2. Once the delivery is completed and quantities measured, a BDN shall be signed and stamped by the Master of the Vessel and returned to Seller or its representative, as acknowledgement of the actual volume only, and a duplicate copy shall be retained by the Master of the Vessel. The BDN may contain the following information: delivered quantity in volume units; delivered quantity in weight units; density in kg/m3 at 15o C as per ISO 3675; flash point; sulfur content in % m/m as per ISO 8754; and viscosity. The BDN as issued may not be amended or written or remarked on. Any attempt to do so is invalid and of no effect and may result in the re-issuance of a clean BDN.

7.3. In the event the Master of the Vessel is not satisfied with the sampling, quality, quantity, or any other matter concerning the Marine Fuel or its delivery, the Master shall, upon completion of delivery, issue Notice by a separate letter of protest, receipt of which must be acknowledge in writing by Seller or its representative. Claims for sampling, quantity or any other matter concerning the Marine Fuel or its delivery are barred should the Master failed to provide the Notice as set out in this Clause 7.3.

7.4. Buyer warrants that it is authorized by the Vessel's owners, operators, and/or managers to order the Marine Fuel delivered to the Vessel and that it has provided a copy of these terms and conditions to the Vessel's owners, operators, and/or managers.

7.5. Buyer further warrants that by receiving the Marine Fuel and signing the BDN, the Master acknowledges that the Vessel is bound by these terms and conditions.

## 8.    PRICE

8.1. The Price as stated in the Confirmation shall not be subject to variation except as may be provided in this Contract. Buyer recognizes that the cost of Marine Fuel is volatile and Seller therefore reserves the right to increase the Price at any time before Delivery. On receipt of Seller's Notice to Buyer of such increase in Price, Buyer may forthwith give Notice to Seller of cancellation of the Contract without penalty. If no such Notice is received within one hour of Seller advising Buyer of the increase of the Price, Buyer shall be deemed to have agreed to the revised Price and the Contract so revised shall remain in full force and effect and any cancellation thereafter shall also continue to be subject to this Contract.

8.2. The Price shall be in the amount expressed per unit and in the currency stated in the Confirmation for each grade of Marine Fuel delivered to the Vessel. In the event the Price is quoted in volume units, conversion to standard volume shall be at sixty (60) degrees Fahrenheit or at fifteen (15) degrees Celsius.

8.3. Any and all additional charges, if applicable, shall be specified in Seller's quotation and in the Confirmation and shall include but not be limited to:

8.3.1.   wharfage charges, barging charges, or other similar charges;

8.3.2.   mooring charges or port dues incurred by Seller which are for Buyer's account; and,

8.3.3.   duties, taxes, charges or other costs in the country where delivery takes place, for which Seller is accountable but which are for Buyer's account.

8.4.   Buyer should attend the Delivery and obtain at that time all outstanding information relating to the Delivery, including the exact quantities and precise specification of the Marine Fuel delivered. Seller shall be under no obligation at any time to produce to Buyer any evidence of the Delivery. It is expressly agreed that Seller's provision to Buyer of proof of delivery including of any BDN is not a prerequisite to payment of the Price.

## 9.   PAYMENT

9.1.   Except to the extent the Confirmation specifies other payment terms, each of the following terms shall apply:

9.1.1.   Payment of the Price will be made in United States dollars to the bank and account specified by Seller in full without deduction for any reason whatsoever, including withholding or deferment on account of any claim, counterclaim, or set-off, so as to ensure that Seller receives full value for the payment in cleared funds on or before the Due Date.

9.1.2.   Due Date is as provided in the Confirmation or, in default, the date of Delivery.

9.1.3.   Timely payment is of the essence of the Contract.

9.1.4.   Late payment will incur a financial charge to Buyer of 2% per calendar month on the outstanding sum calculated on a daily basis from the Due Date until receipt by Seller. Accrued financial charges will be added to and become part of the outstanding sum at monthly intervals. In the event that the financial charge specified in the Contract is in excess of that permitted by relevant law, there shall be substituted the maximum amount so permitted.

9.1.5.   Payment will be made by way of telegraphic, telex, swift or rapid electronic transfer to the bank and account specified by Seller. All bank and other charges, if any, incurred in effecting remittance will be for the account of Buyer. Buyer will give Seller immediate Notice, including identifying references, of payment of the Price.

9.2.   Payment for the Marine Fuel shall be made as set forth in the Confirmation. In the event payment has been made in advance of delivery, same shall be adjusted on the basis of the actual quantities of Marine Fuel delivered and additional payment and/or refund shall be made within thirty (30) days after the completion of delivery.

9.3.   Should Buyer appear to be in financial difficulty or unable to meet its obligations to other creditors as they become due, Seller on written Notice to Buyer may accelerate the payment date hereunder in which case payment is immediately due.

In consideration of this acceleration, Buyer is entitled to a credit against the principal amount due of 2% per month (prorated over 30 days) for every day the payment is early.

9.4.    Payment shall be deemed to have been made on the date the payment is credited to the counter of the bank designated by Seller. If payment falls on a non-Banking Day, then payment shall be made on or before the last Banking Day before the due date.

9.5.    Seller may apply payments received from or on behalf of Buyer, notwithstanding any specific request to the contrary, to obligations of Buyer at the sole discretion of Seller in any order, including but not limited to the following in diminution or extinction of:

9.5.1.    Accrued financial and other charges in respect of transactions for which the principal sum has been previously paid;

9.5.2.    Accrued financial and other charges arising from all other transactions;

9.5.3.    Any principal sum or sums due and outstanding commencing with the oldest and proceeding chronologically thereafter to the most recent;

9.5.4.    Any principal sum which Seller knows or reasonably expects will fall due at a future date;

9.5.5.    Any amount which is not subject to a maritime lien or other form of security available to Seller.

9.6.    Any attempt by Buyer to assign payments to certain invoices or amounts shall be null and void.

9.7.    Seller may in good faith vary, amend, withdraw, substitute, or add to the terms relating to payment of the Price at any time in the course of a transaction in such a manner as it shall in its absolute discretion consider necessary to protect its interests.

9.8.    Buyer shall be responsible to confirm directly with Seller, by telephonic or other reliable means, the instructions including wiring or other payment details, for receipt by Seller of the Price and other amounts due to Seller. It shall be Buyer's sole responsibility to assure that Seller receives and confirms receipt of each payment from Buyer to Seller. Seller shall not be responsible for diversion from Seller of any such payment, whether because of communications which appear to originate from Seller or for any reason otherwise. If Buyer makes payment which it believes is to Seller, but Seller does not receive that payment, Buyer shall remain responsible for making timely payment received by Seller.

9.9.    In the event of non-payment, Seller reserves the right to pursue all legal remedies available to recover all amounts owed. Seller shall have a maritime lien on the Vessel identified by its IMO number until payment and interest has been received by Seller. "No-Lien Stamps" or remarks in any form or wording on the BDN shall be invalid and of no effect, and shall in no way impair Seller's lien or discharge the Vessel's responsibility for debts under this Contract.

9.10.   Seller may at any time, with or without cause and without prejudice to all other rights and remedies which they may have, withdraw or suspended credit facilities from Seller to Buyer and all sums outstanding shall thereupon shall be due for Buyer's immediate payment to Seller.

9.11.   In the event that Buyer or any subsidiary or parent thereof shall be insolvent, commit an act of bankruptcy, or otherwise shall be the subject of proceedings, judicial or otherwise, commenced for debt, bankruptcy, insolvency, liquidation, or winding up, or in the event that Seller has reasonable grounds for insecurity such as, without limitation, Buyer (in Seller's sole judgment) is likely to be unable to make timely payment to Seller, Seller may immediately and without Notice terminate the Contract and demand that Buyer immediately pay all amounts due under the Contract. Buyer agrees that Seller possesses priority over all other claims against Buyer.

**10.    CLAIMS**

10.1.   **Notice of any claim or potential claim must be given to Seller within the time limits specified in this Clause 10.** It is Buyer's sole responsibility to ensure that Notice is received by Seller, whose confirmation of receipt is required. Regardless of whether a claim or dispute has arisen or is anticipated, Buyer must always give prompt Notice to Seller of any discrepancy, error, or omission present in any form or document tendered, submitted, or produced by the Physical Supplier and of any unusual occurrence relating to the Delivery.

10.2.   **Unless otherwise stated in the Confirmation, the time limit for receipt by Seller of Notice of a quantity dispute is forty-eight (48) hours from the date of Delivery.**

10.3.   **Unless otherwise stated in the Confirmation, the time limit for receipt by Seller of Notice of a quality dispute is twenty-one (21) days from the date of Delivery.**

10.4.   **Notice of all other claims, specifically excluding any and all claims relating to or associated with quantity or quality which are subject to the time limits of this Contract, must be given to Seller as soon as reasonably possible and in any event no later than twenty-eight (28) days from the date of Delivery, or such shorter period as is specified in the Confirmation.**

10.5.   To enable Seller to investigate and pursue a claim, the Notice must give sufficient information for Seller to be able to identify the relevant transactions, the nature of the complaint, and the loss or damage alleged. Any Notice which does not give such sufficient information will not be valid. Buyer must provide a full and complete response to any and all questions, enquiries, and requests made of it by Seller concerning the claim and matters relating thereto.

10.6.   For bulk deliveries, delivery barges, wagons, and vehicles must be checked by Buyer by tank dipping to measure the contents and ensure full turnout. Flow meters must be checked by Buyer for seals, correct settings and calibration, and general condition. All of these checks must be carried out by Buyer before and after delivery of each consignment and each barge, wagon, or vehicle tank load. The Delivery must be supervised by Buyer at all times and care must be taken in

ensuring that all documentation is complete and accurate before signing and stamping. Any discrepancies must be recorded on the BDN. Buyer understands that unless these procedures are followed, it is nearly always impossible for a claim to be substantiated. Buyer understands that where these receiving procedures are not followed, claims will not be allowed.

10.7.   Seller will not accept a claim for short delivery based upon figures obtained by measuring the Marine Fuel in the Vessel's tanks.

10.8.   Buyer is solely responsible to ensure that the quality of the Marine Fuel tendered for Delivery is that which is required by the Vessel and that the Marine Fuel is delivered into the correct tanks.

10.9.   Buyer is solely responsible for confirming that all documentation is in order and for noting any discrepancies on the BDN before signing and stamping.

10.10.   If Buyer has grounds to believe that the Marine Fuel supplied does not accord with the relevant description in the Confirmation or is defective, Buyer shall immediately:

10.10.1.   Take all steps to mitigate the consequences of having been supplied with the Marine Fuel.

10.10.2.   Give Seller Notice with full details of the Marine Fuel, together with the Vessel's position, destination, and ETA; the quantities and locations of all bunkers on board the Vessel; the rate and quantity of consumption since delivery and the location immediately prior to consumption of bunkers consumed; and for each of the three preceding deliveries to the Vessel, the place and date of supply, the name of any supplier, and the quantity, quality, and specification of marine fuel or material similar to the Marine Fuel supplied.

10.10.3.   Inform Seller of the whereabouts of Buyer's set of samples of Marine Fuel.

10.10.4.   If Buyer lodges a claim within the time limits set forth in this Contract, Seller may proceed to have the Physical Supplier's samples analyzed by a reputable independent testing laboratory. The results of such analysis shall at Seller's sole discretion be binding. Seller may also decide that Buyer's set of samples of the Marine Fuel be analyzed by a reputable independent testing laboratory. The results of such analysis shall also at Seller's sole discretion be binding Parties hereto. In no event, however, shall Buyer's tests of samples of the Marine Fuel be binding.

10.10.5.   If it is alleged that any equipment or machinery has been damaged by defective Marine Fuel, Notice with full details must be given to Seller at the earliest opportunity and the item to which there is alleged damage must be preserved and made available for inspection on demand by Seller or its representative. The foregoing shall not be considered an undertaking of any liability by Seller or a waiver of Seller's rights hereunder.

10.11.   **Within thirty (30) days of providing Notice of a claim, Buyer shall provide Seller with all documentation supporting Buyer's claim**, including, but not

limited to, all analyses performed on the Marine Fuel. Buyer shall immediately give Seller opportunity to inspect the Vessel, including, without limitation, its engines, fuel tanks, equipment, logs, records, and copies of communications, including communications between the Vessel and Buyer (and/or between the Vessel and its owner, operator, or manager), as well as communications to and from fuel testing organizations consulted by Buyer or Vessel interests.

10.12. If Notice of any claim is not provided within the respective time periods this Contract specifies, or the conditions of this Contract for making any claim are not met, Buyer shall be time-barred from making a claim. It is further agreed that **any such claims are time-barred if Buyer does not commence litigation concerning the claim within one (1) year of the Delivery date.** Such litigation may only be brought, exclusively, in the United States District Court for the Southern District of New York. A further prerequisite of bringing any such litigation is Seller's full receipt of the Price and all other amounts billed by Seller to Buyer through this Contract.

10.13. A claim of any nature by Buyer does not relieve Buyer of the responsibility and obligation to make full and timely payment to Seller of the Price and of all other amounts billed by Seller.

## 11.   RISK / TITLE

11.1.  Seller's responsibility for the Marine Fuel shall cease and Buyer shall assume all risks and liabilities relating thereto, including loss, damage, deterioration, depreciation, contamination, evaporation, or shrinkage of the Marine Fuel and responsibility for loss, damage and harm caused by pollution or in any other manner to third parties when the Marine Fuel passes the flange connecting Seller's or Physical Supplier's delivery facilities, including any Bunker Tanker, with the receiving facilities of Buyer including but not limited to the Vessel, whether the Marine Fuel is provided ex-wharf or by Bunker Tanker.

11.2.  Title to the Marine Fuel shall only pass to Buyer upon irrevocable payment for the value of the Marine Fuel delivered, pursuant to the terms of the Contract. Until such time as payment is made, on behalf of itself and the Vessel, Buyer agrees that it is in possession of the Marine Fuel solely as bailee for Seller. If, prior to payment, the Marine Fuel is commingled on board the Vessel with other material like the Marine Fuel, title to such material shall remain with Seller corresponding to the quantity of the Marine Fuel delivered. The above is without prejudice to such other rights as Seller has under this Contract and the laws of the governing jurisdiction in any action by Seller against Buyer and/or the Vessel in the event of non-payment. The laws of the United Kingdom specifically as applied in THE "SPAN TERZA", [1984] 1 Lloyd's Rep. 119 shall apply to and control the application and enforcement of this Clause.

11.3.  Buyer agrees that it shall disclose to any Ultimate Purchaser and to any and every Intermediate Buyer of the Marine Fuel that Seller continues to hold title to the Marine Fuel until Seller receives the Price and all other amounts which Seller bills to Buyer.

11.4.   Regardless of whether Buyer has made the disclosure required under Clause 11.3, Seller shall continue to hold title to the Marine Fuel as set out in the Contract.

**12.   LIMITATION OF LIABILITY**

12.1.   Notwithstanding any provision in this Contract or in the Confirmation to the contrary, Seller shall not be liable to Buyer for any loss or damage, including loss of profit or any other consequential damages or loss whatsoever, arising from any cause whatsoever whether in contract, tort, or otherwise, including due to the negligence of Seller, its servants, agents, or sub-contractors, beyond the difference in the value of the Marine Fuel and the Marine Fuel actually supplied, **but in no event to exceed the amount of USD 50,000.** Consequential damages or loss includes lost profits and any and all damage claims involving any delay in delivery, failure to make delivery, supply chain interruptions, and contracts and/or prospective contracts, detention, demurrage, charter hire, crew wages, towage, pilotage, lost profits, barge delivery charges and increased costs or expenses in obtaining replacement fuel.

12.2.   Buyer acknowledges and warrants that it is Buyer's responsibility to test the Marine Fuel and to ensure that it is proper in all respects prior to use of such Marine Fuel on the Vessel. Accordingly, Seller shall not be responsible for any damage to the Vessel, including without limitation, its machinery, tanks, or their contents, caused by Delivery of improper, defective, wrong, or otherwise unsuitable Marine Fuel.

**12.3.   DISCLAIMER OF WARRANTIES. THE MARINE FUEL IS SOLD AS IS WHERE IS AND ANY IMPLIED WARANTIES WHATSOEVER, WHETHER STATUTORY OR OTHERWISE, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE OR OF CONDITION, AND ANY ORAL OR IMPLIED AGREEMENTS, ARE EXPRESSLY EXCLUDED AND DISCLAIMED.**

12.4.   Seller shall not be liable to Buyer for any loss of profit, loss of use, or loss of Marine Fuel whatsoever, whether arising directly or indirectly from the performance or non-performance of this Contract, and whether or not the same is due to negligence or any other fault of Seller, its servants, or agents.

12.5.   Notwithstanding the foregoing, in the event that Seller is found to be liable to Buyer, the total amount payable by way of compensation shall not exceed the Price charged to Buyer for the Marine Fuel supplied under this Contract. It is a pre- condition to the payment of any compensation by Seller that the Price and all other sums billed by Seller to Buyer are first received by Seller.

**13.   INSURANCE**

Buyer is responsible for effecting and maintaining insurance which will fully protect Buyer, Seller, and all third parties connected in any way to this Contract and/or the Delivery from liability and damages arising from or in relation to all risks, hazards, and perils related to or arising from this Contract and provision of Marine Fuel.

**14.   LICENSES / PERMITS / APPROVALS**

Buyer shall obtain all necessary permits, licenses, and approvals required to enable all parties involved in any way with the Delivery to execute all of their obligations under the Contract.

## 15.    GOOD PRACTICE

Buyer shall, in addition to observing and complying with the terms of the Contract, abide by generally accepted good operating practices and procedures all in compliance with local rules and regulations.

## 16.    COMPLIANCE WITH LAWS AND REGULATIONS

16.1.   Buyer will not do or permit to be done anything which might cause any breach or infringement of the laws and regulations of the Flag State, or of the places where the Vessel trades or takes Marine Fuel.

16.2.   Except as otherwise expressly provided herein, Buyer (including each of its directors, employees, or agents) shall not, without express written permission of Seller:

16.2.1.   give to or receive from Seller (including Seller's directors, employees, or agents) any commission, fee, rebate, gift or entertainment of significant cost or value in connection with this Contract;

16.2.2.   enter into any business arrangement with any director, employee, or agent of Seller not acting as a representative of Seller;

16.2.3.   pay, directly or indirectly, any funds or anything of value to any public official or official of a national or international organization for the purpose of influencing such person's acts or decisions in violation of the applicable laws of the United States of America, the European Union or the laws of the jurisdiction in which the delivery of the Marine Fuel was made.

## 17.    SANCTIONS COMPLIANCE

17.1.   The following provisions shall apply where any sanction, prohibition, or restriction is imposed on any specified persons, entities, or bodies including the designation of any specified vessels or fleets under United Nations resolutions or trade or economic sanctions, laws, or regulations of the European Union or the United States of America.

17.2.   Buyer warrants that at the date of entering into this Contract and continuing until delivery of the Marine Fuel and payment by Buyer to Seller in full of all amounts billed that:

17.2.1.   Buyer is not subject to any of the sanctions, prohibitions, restrictions, or designation which prohibit or render unlawful any performance under this Contract;

17.2.2.   Buyer is purchasing the Marine Fuel as principal and not as agent, trustee, or nominee of any person with whom transactions are prohibited or restricted; and,

17.2.3.   The Vessel is not a designated vessel and is not and will not be chartered to any entity or transport any cargo contrary to the restrictions or prohibitions in this Clause 17.

17.3.   Seller shall not be required to do anything which constitutes a violation of the laws and regulations of any jurisdiction to which Seller is subject.

17.4.   Buyer shall indemnify Seller against any and all claims, including seizure or return of any payment, losses, damage, costs, and fines whatsoever, suffered by Seller resulting from any breach of warranty as aforesaid and in accordance with this Contract.

17.5.   Buyer confirms that Buyer abides by international trade sanctions regulations. Seller expressly reserves the right without liability to terminate the Contract and/or not to deliver to vessels or persons which are subject to or are carrying flags of any country subject to international trade sanctions.

## 18.   TERMINATION

Without prejudice to any accrued rights hereunder, Seller shall be entitled to terminate this Contract in the event of:

18.1.   Any application being made, any proceedings being commenced, or any order or judgment being given by any court for

18.1.1.   The liquidation, winding up, bankruptcy, insolvency, dissolution, administration, or reorganization or similar; or

18.1.2.   The appointment of a receiver, liquidator, trustee, administrator, administrative receiver, or similar functionary of Buyer of all or a substantial part of its assets (otherwise than for the purpose of a reconstruction or amalgamation);

18.2.   Buyer or any of its affiliates failing to pay its debts as they become due or suspending payment of its financial obligations, ceasing to carry on business, or compounding or making any special arrangement with its creditors; or,

18.3.   Any act being done or event occurring which, under the applicable law thereof, has a substantially similar effect to any of the said acts or events described above.

## 19.   INDEMNITY

Without prejudice to any other claims arising hereunder or in connection herewith, if loss is suffered or a claim or liability is incurred by or against Seller as a direct result of acts or omissions of Buyer, Buyer will defend and indemnify Seller in respect of such loss or liability. Seller shall have the right to direct the defense provided as well as to settle any loss, claim or liability. Buyer shall provide this indemnity regardless of whether the loss, claim, or liability is, or is claimed to be, the result of Seller's own negligence.

## 20.   FORCE MAJEURE

20.1.   Seller shall not be liable for any failure to fulfill any term or condition of the Contract if fulfillment has been delayed, hindered, or prevented by any circumstances whatsoever which are not within the immediate control of Seller,

including, , without limitation, the generality any of the foregoing: act of God; act of third party; fault or failure of vessel, master, or crew; act or omission of Buyer; strike, lockout, or labor dispute or reasonable apprehension thereof; government order, request, or restriction; and/or limitation, restriction, or interruption to existing or contemplated sources of supply of Marine Fuel or the means of supply thereof, including but not limited to failure to deliver by the Physical Supplier.

20.2.    In the event that performance is prevented or delayed by Force Majeure, Seller may cease or reduce deliveries in any manner as it may determine in its sole discretion. Nothing in this Clause shall be deemed to excuse Buyer from the obligation to make payments for the Marine Fuel delivered.

## 21.    SAFETY AND THE ENVIRONMENT

21.1.    In the event of any spillage (which for the purpose of this Clause shall mean any leakage, escape, spillage, or overflow of the Marine Fuel) causing or likely to cause pollution occurring at any stage of the bunkering operation, Buyer shall (regardless as to whether Buyer is responsible) immediately take such actions as are reasonably necessary to effect clean up and which shall always be conducted in accordance with such local laws and regulations which may compulsorily apply.

21.2.    Where it is a compulsory requirement of the law of the Place of Supply and/or Point of Delivery of the Marine Fuel that Buyer shall have in place its own oil spill contingency plans, Buyer shall ensure that it has in place valid oil spill contingency plans.

21.3.    Buyer hereby guarantees payment of and/or agrees to indemnify, defend, and hold Seller harmless for any claims, losses, damages, expenses, penalties, or other liabilities incurred by Seller under any state, national, or international oil pollution legislation as a result of any spillage occurring while the Marine Fuel is being transported directly or indirectly to or from the Vessel. Buyer shall similarly indemnify, defend, and hold Seller harmless where any such spillage occurs once risk in the Marine Fuel has passed to Buyer. Seller in such events shall have the right to direct the defense and to settle any claims, losses, damages, expenses, penalties, or other liabilities. This Clause shall apply even if the claims, losses, damages, expenses, penalties, or other liabilities arise or are claimed to arise from Seller's sole negligence.

## 22.    DRUG AND ALCOHOL POLICY

22.1.    Buyer shall enforce a company drug and alcohol policy on board and adjacent to the Vessel and/or the Bunker Tanker.

22.2.    Buyer's drug and alcohol policy shall meet or exceed the standards in the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended.

22.3.    Buyer's and the Vessel's personnel shall comply with Buyer's drug and alcohol policy while at Seller's facilities and on board or adjacent to the Vessel and/or the Bunker Tanker.

22.4.   Buyer acknowledges and agrees that in any relation to this Contract, the selling, possession, distribution, use or being under the influence of alcohol or any controlled substance or dangerous drugs other than those medically prescribed is prohibited.

## 23.   NO THIRD PARTY RIGHTS

Except as confirmed by a signed writing of Seller, no third parties may enforce any term of this Contract.

## 24.   ASSIGNMENT

24.1.   Buyer shall not and may not assign its interest in this Contract without Seller's prior written approval.

24.2.   Seller may assign this Contract and/or its interest therein without notice to Buyer.

## 25.   SEVERABILITY

If any term of this Contract is, becomes, or is held to be illegal, invalid, or unenforceable in any respect under any law or jurisdiction, such term shall be deemed amended to the extent necessary to avoid such illegality, invalidity, or unenforceability, or, if such amendment is not possible, such term shall be deemed deleted from this Contract to the extent of such illegality, invalidity, or unenforceability, and the remaining terms shall continue in full force and effect and shall not in any way be affected or impaired thereby.

## 26.   BREACH OF CONTRACT

26.1.   If Buyer cancels, terminates, or otherwise fails to take delivery, in whole or in part, of the Marine Fuel, Buyer shall be responsible for all costs resulting from such failure, including without limitation, lost profits and any costs and expenses incurred by Seller to downgrade the Marine Fuel or return unaccepted quantities of the Marine Fuel. In such instance, Seller shall not be responsible for any costs resulting from such failure, including without limitation, replacement costs and expenses incurred by Buyer. Clause 26.1 does not apply where Buyer cancels subject to the provisions of Clause 8.1.

26.2.   Seller may treat any other breach by Buyer of any term of the Contract as a breach of a condition and it may, at its discretion, continue to perform under this Contract or treat the Contract as repudiated or terminated and seek such remedies as it considers appropriate. All terms of the Contract related to recovery of the Price and amounts due to Seller, the limit of liability of Seller and limitation on any claims, and Buyer's responsibility to defend, indemnify, and hold Seller harmless, as well as all other Contract terms that Seller may declare to continue in force, shall survive such termination and repudiation.

## 27.   LIENS / CHOICE OF LAW / JURISDICTION / VENUE

27.1.   In addition to any other security Seller may have (including retention of title to the Marine Fuel), where the Marine Fuel is provided to a vessel, , Buyer agrees that it enters this Contract pledging, and that Seller provides the Marine Fuel relying on, the credit of the Vessel. It is agreed and acknowledged that a maritime lien *in rem* against the Vessel is thereby created for the Price and all other amounts owed by

Buyer to Seller for provision of the Marine Fuel to the Vessel. Seller may enforce and execute on such maritime lien *in rem*, and maritime claim, in any court having jurisdiction. Buyer represents that it is the Vessel's owner, or charterer, or a person authorized by the Vessel's owner or charterer, to have Seller (including the Physical Supplier) provide the Marine Fuel to the Vessel on the credit of the Vessel. If Buyer is not the owner of the Vessel, Buyer hereby expressly warrants that Buyer has the authority of the owner to pledge the Vessel's credit as aforesaid. Buyer warrants that such owner has been given notice of this Contract and this term of the Contract.

27.2.   Any Notice by Buyer or any other entity that a maritime lien on the Vessel may not be created, including because of the existence of a prohibition of lien term in any applicable charter, must be given to Seller in the specific order for the Marine Fuel, and in any event before issuance of the Confirmation. Seller shall not be bound by any attempt by any person to restrict, limit, or prohibit its lien or liens attaching to the Vessel unless Notice of the same is given to Seller in the initial order for the Marine Fuel and before Seller sends its Confirmation to Buyer.

27.3.   Where Notice is given pursuant to Clause 27.2,

27.3.1.   no credit can be granted to Buyer;

27.3.2.   Seller may demand that Buyer makes full payment of the Price and all amounts otherwise due Seller in cash or equivalent prior to Delivery; and/or,

27.3.3.   Seller may terminate or rescind this Contract, including any obligation to provide Marine Fuel, without penalty.

27.4.   Any communication or attempted communication of a no lien provision that does not comply with Clause 27.2 shall be of no effect. No communication or attempted communication to any Physical Supplier of a no lien provision or restriction, by way of any BDN or otherwise, shall ever be effective.

27.5.   Except as expressly stated herein, this Contract is subject to and governed by United States maritime law (including the United States Commercial Instruments and Maritime Lien Act, 46 U.S.C. Sections 31301 *et seq.*). Buyer irrevocably submits to the exclusive jurisdiction and venue of the courts of the United States of America and waives any objections to such forum based upon *forum non conveniens* or venue. To the extent United States maritime law does not provide a rule of law, New York law applies. Notwithstanding the foregoing, Seller retains the right to enforce its maritime lien and attachment rights against the Vessel, and any other rights under this Contract, in any court or tribunal of any state or country in Seller's sole discretion. United States maritime law shall apply to any determination of the existence and priority of a maritime lien, regardless of the jurisdiction in which Seller takes action.

27.6.   Service or notice of process shall be complete on Buyer when made by Seller to Buyer by facsimile or other electronic means. Such service or consent to jurisdiction and venue shall not be construed to mean that Buyer has an agent present in or adjacent to the jurisdiction of enforcement within the meaning of United States maritime law, including Supplemental Rule B.

27.7.    If Buyer is or claims to be a foreign sovereign entity within the meaning of the United States Foreign Sovereign Immunities Act or similar law, Buyer expressly waives its rights under that Act or similar law, including any immunity or exemption from prejudgment attachment, *in rem* arrest or attachment of any vessel, or other prejudgment process.

27.8.    In the event of a conflict between admiralty and bankruptcy jurisdiction, it is agreed that admiralty jurisdiction pre-empts bankruptcy jurisdiction with respect to the rights and obligations under this Contract and with respect to enforcing maritime lien or attachment rights.

27.9.    Buyer shall, in connection with any action by Seller to recover from Buyer and/or the Vessel any amount of the Price or other amount owed to Seller, and/or any action by Seller to enforce this Contract, pay to Seller all of Seller's actual attorneys (including para-professional) fees, costs, and expenses.

27.10.   In consideration of Seller's extension of credit to Buyer, Buyer irrevocably assigns to Seller all right, title, and interest to all claims and security interests, including but not limited to maritime liens *in rem* (herein, the "Assigned Claims") which Buyer may have arising out of any transaction or provision involving any vessel receiving the Marine Fuel, including but not limited to any claim for a maritime lien *in rem* which the Buyer may have against such vessel, until Seller is fully paid the Price and all amounts due Seller.

27.11.   In further consideration of Seller's extension of credit to Buyer, Buyer agrees that for the sole purpose of providing the Marine Fuel to the Vessel, directly or indirectly, Buyer and each Intermediate Buyer serves as the limited agent of Seller for the purpose of providing the Marine Fuel to the Vessel and receiving an order for that Marine Fuel, and that this Contract shall extend to each Intermediate Buyer and Ultimate Purchaser. Each order for Marine Fuel from any Ultimate Purchaser to any Buyer (including any Intermediate Buyer) shall be considered an order for Marine Fuel from that Ultimate Purchaser to Seller, with Seller relying on the full credit of the Vessel to secure payment of the Price and all amounts owed to Seller, and Seller further receiving assignment of all rights that Buyer and any Intermediate Buyer otherwise may have for the Price.

27.12.   Seller shall hold exclusive title to and have the exclusive right to exercise and enforce its rights to such Assigned Claims until Seller is fully satisfied for all amounts which the Assigned Claims secure. Seller may proceed anywhere in the world, including in the name of Buyer, to assert and recover on its Assigned Claims, including but not limited to arrest of the Vessel and/or for recovery from Buyer and any debtor to Buyer.

27.13.   Buyer agrees in turn that it will require any further entity to which Buyer sells or purports to sell the Marine Fuel, to assign to Seller all of such further entity's Assigned Claims. Buyer further agrees that it will within one (1) day of Seller's request provide Seller with the identity, including telephone, email, and facsimile address, of each Intermediate Buyer and each Ultimate Purchaser.

27.14.   In the event that any Buyer (including any Intermediate Buyer and any purported assignee of the Buyer), receives any part of the Price from any entity before Seller is fully paid the Price and all other amounts Seller has billed in connection with this Contract, Buyer and its assignee agree that they receive that amount only as trustee, custodian, and fiduciary for and of Seller. In no event shall such amount of the  Price be Buyer's (or any Intermediate Buyer's or Buyer's assignees') property but, in all events Buyer and any assignee shall hold such Price as custodian, trustees, and fiduciary and pay to Seller the Price as soon as received by any Buyer.

27.15.   Buyer grants Seller a limited power of attorney to execute on Buyer's behalf such documents, including filings under the Uniform Commercial Code of any United States state or similar government body under any law providing for registration of any security interest, any filing which Seller may consider helpful to perfect any security interest which Seller holds under this Contract.

27.16.   Upon Seller's receipt of full payment of the Price and all other amounts which Seller has billed to Buyer, Seller transfers and assigns to Buyer all maritime liens, other security, and *in personam* claims against the Ultimate Purchaser which Seller has related to the Marine Fuel. Until such time, neither Buyer nor its assignees has any right except as trustee, fiduciary, and custodian for Seller, to claim or collect any amount related to the Marine Fuel and owed by any entity.

## 28.   NOTICE

28.1.   The giving of any Notice may be fulfilled by the use of facsimile transmission, or email with return receipt. The communication shall be deemed to have been given to and received by Seller only upon Seller's return written confirmation of receipt of such Notice.

28.2.   Should Buyer give Notice under this Contract, Buyer shall ensure that it is effectively given to and received by Seller during Seller's office hours. If such Notice is sent outside Seller's office hours it shall be treated as received during Seller's next working day.

## 29.   ENTIRE AGREEMENT

29.1.   This Contract states the entire agreement between Buyer and Seller in relation to the order, sale, and purchase of the Marine Fuel and supersedes all previous agreements whether oral or written between Buyer and Seller in relation thereto.

29.2.   Buyer acknowledges that in entering into this Contract, Buyer has not relied on and shall have no right or remedy in respect of any statement, representation, assurance, or warranty (whether or not made negligently) other than what this Contract expressly sets out.

29.3.   Any terms implied into this Contract by any law, opinion, or construction are hereby excluded. Nothing in this Contract shall limit or exclude any liability for fraud by Buyer.

29.4.   Each provision of marine fuel by Seller to Buyer shall constitute a separate Contract, except that, prior notice to Buyer of the terms of this Contract shall be

considered notice of the terms of this Contract for current and subsequent applications of the terms of this Contract.



# EXHIBIT 3



# STURZENEGGER & CO LLC

shipping and trading legal services

Holman Fenwick Willan USA LLP
5151 San Felipe, Suite 400,
Houston, Texas 77056

<u>Attention: Gerard J. Kimmitt</u>

Geneva, 8 July 2019

Dear Sirs,

**MV "*SFL Yukon*" – Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018**

We refer to our telephone conversation of this afternoon and confirm that we represent Kamca Trading SA.  We refer also to previous correspondence exchanged by Kamca with your Mr Chris Hart subsequent to your notice of claims addressed to Kamca dated 13 August 2018, which exchanges continued sporadically through until January 2019.

We confirm that it has come to our attention that your firm has filed a complaint against Kamca and Glencore in respect of these claims before the US District Court for the Southern District of Texas, Houston Division.  It is unclear why that form has been chosen when previous correspondence between Kamca and your firm has expressly referred to the General Terms and Conditions of Sale of Kamca which provide in clause 10.12 for claims to "*brought, exclusively, in the United States District Court for the Southern District of New York*".  There are good reasons of efficiency and economy why Kamca would wish any such proceedings to be brought before that court.

However, it may be that your client's proceedings are, in any case, premature given that we have understood that the complaint seeks indemnification for contingent losses that your client may incur arising from claims brought by the head owners of the vessel, and which are currently the subject of an arbitration reference in London.  If those proceedings are being defended by your client, it may be that the claims in London will not result in an adverse award so that your client would incur no loss for potential recovery in its proceedings against Kamca.

In view of this, Kamca would be willing consider entering into a stand-still agreement with your client on terms to be mutually agreed providing for the preservation of the parties' existing rights and defences before the New York court pending the outcome of the arbitration reference in London.  Please take instructions on the matter and let us know if this might be approved as a means of dealing with the current situation.

Your faithfully,
**STURZENEGGER & CO LLC**

Marc Sturzenegger

# EXHIBIT 4

**Marc Sturzenegger**

| | |
|---|---|
| **From:** | Jerry Kimmitt <jerry.kimmitt@hfw.com> |
| **Sent:** | mercredi, 7 août 2019 15:22 |
| **To:** | Marc Sturzenegger |
| **Cc:** | Chris Hart |
| **Subject:** | RE: MV SFL Yukon - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018 [HFWHOU-HOUIMAN.FID27706] |

Dear Mr. Sturzenegger,

We have your email dated 2 August 2019 and your letter dated 8 July 2019.  We have considered your proposal for a stand-still agreement, but we think that would be premature at this time.  We are in the process of having the Houston lawsuit papers served formally to Kamca in Switzerland.  In our view, it will be beneficial for all concerned to proceed with the lawsuit in Houston so that Kamca and Glencore enter their appearances.  We understand that Kamca has retained samples of the fuel drawn upon delivery of the bunkers in Panama.  We would like to get those Kamca retained samples tested at a suitable lab.  Depending on results of those tests, we and our client might consider staying the lawsuit pending outcome of the arbitration.  In the meantime, we prefer to continue with the lawsuit at least to the point of Glencore and Kamca entering appearances and participating in discovery to facilitate getting the Kamca samples tested.

Could you advise whether Kamca is willing to facilitate having the samples tested promptly?  We have in mind a joint testing done at a lab in Houston, and Glencore would be invited to attend as well, along with representatives of Kamca and our client, too.  We presume the Kamca samples are retained in Panama, but would appreciate it if you would confirm who currently has custody of the samples and where they are located.

Kind regards
Jerry Kimmitt
Partner
**HFW**

+1 (713) 706 1943  (internal ext 5103) | **M** +1 (832) 715 5301
**E** **jerry.kimmitt@hfw.com**

HFW, 5151 San Felipe, Suite 400, Houston, Texas 77056, USA
**T** +1 (713) 917 0888 | **F** +1 (713) 953 9470 | **hfw.com**

**From:** Marc Sturzenegger <mns@sturzenegger-co.ch>
**Sent:** Friday, August 2, 2019 7:17 AM
**To:** Jerry Kimmitt <jerry.kimmitt@hfw.com>
**Subject:** RE: MV SFL Yukon - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018

Dear Mr Kimmitt,

We refer to our letter dated 8 July 2019 to which we have not seen a response.  Please let us know your client's instructions in the matter.

Best regards,

Marc Sturzenegger



| | | | | | Email: info@sturzenegger-co.ch |
|---|---|---|---|---|---|
| **Sturzenegger & Co LLC** Rue du Mont-Blanc, 26 | 1201 Geneva Switzerland | Tel : Fax : Mobile : | +41 (0) 22 365 66 20 +41 (0) 22 365 66 22 +41 (0) 79 436 54 10 | | Web: www.sturzenegger-co.ch |

*This message is confidential and may be privileged. If you are not named as a recipient*
*please inform us immediately and do not disclose its contents to anyone else*

---

**From:** Marc Sturzenegger
**Sent:** lundi, 8 juillet 2019 22:38
**To:** jerry.kimmitt@hfw.com
**Subject:** MV SFL Yukon - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018

Dear Mr Kimmitt,

Please see the attached.

Best regards,

Marc Sturzenegger



| | | | | | Email: info@sturzenegger-co.ch |
|---|---|---|---|---|---|
| **Sturzenegger & Co LLC** Rue du Mont-Blanc, 26 | 1201 Geneva Switzerland | Tel : Fax : Mobile : | +41 (0) 22 365 66 20 +41 (0) 22 365 66 22 +41 (0) 79 436 54 10 | | Web: www.sturzenegger-co.ch |

*This message is confidential and may be privileged. If you are not named as a recipient*
*please inform us immediately and do not disclose its contents to anyone else*

HFW is Holman Fenwick Willan USA LLP, which is a limited liability partnership registered in England and Wales (with registered number OC412721) and is authorised and regulated by the Solicitors Regulation Authority, with registered number 632257. A list of members' names is open to inspection at the registered office, Friary Court, 65 Crutched Friars, London EC3N 2AE.

This e-mail (including all attachments) is intended for the named addressee. It is confidential and may be privileged. If you have received it in error, please contact us immediately and then delete it. You should not disclose its contents to any other person. For more information on how we may process your personal data, please read our Privacy Notice.

**Our bank account details will be provided to you when necessary, and you will be informed by letter if these change. Please do not reply to or act upon any email you receive purporting to advise you that our bank account details have changed and if you do receive any such communication, please telephone us and speak to your contact at our office. We will also require independent verification of changes to any account to which we are asked to send money.**

This message has been scanned for viruses by Mimecast.

**Americas  |  Europe  |  Middle East  |  Asia Pacific**

Please consider your environmental responsibility before printing this email.

# EXHIBIT 5

## Marc Sturzenegger

| | |
|---|---|
| **From:** | Marc Sturzenegger |
| **Sent:** | samedi, 28 septembre 2019 23:52 |
| **To:** | 'Chris Hart' |
| **Cc:** | 'Jerry Kimmitt' |
| **Subject:** | RE: MV SFL Yukon - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018 [HFWHOU-HOUIMAN.FID27706] |
| **Attachments:** | Scan_20190923_120417.pdf; CCF23092019_0002.pdf; CCF23092019_0001.pdf; 980302527700009757_accuse_de_reception.pdf; CCF24092019.pdf; Kamca - Free translation of registered letter from Authorities in Fribourg.pdf; Scan_20190928_234849.pdf |

Dear Mr Hart,

We have seen no response to our messages of 24 September 2019.  Please find attached our letter in follow up to the matter and its attachments.

Best regards,

Marc Sturzenegger



| | | | | |
|---|---|---|---|---|
| **STURZENEGGER & CO LLC** <br> *shipping and trading legal services* | **Sturzenegger & Co LLC** <br> Rue du Mont-Blanc, 26 | 1201 Geneva <br> Switzerland | Tel :    +41 (0) 22 365 66 20 <br> Fax :    +41 (0) 22 365 66 22 <br> Mobile :   +41 (0) 79 436 54 10 | Email: info@sturzenegger-co.ch <br> Web: www.sturzenegger-co.ch |

*This message is confidential and may be privileged. If you are not named as a recipient please inform us immediately and do not disclose its contents to anyone else*



# STURZENEGGER & CO LLC

shipping and trading legal services

Christopher R. Hart, Esq.
Holman Fenwick Willan USA LLP
5151 San Felipe, Suite 400
Houston, Texas 77056

By email: chris.hart@hfw.com

28 September 2019

Dear Mr Hart,

**M/V "*SFL Yukon*" - Sale and Delivery of Bunkers RMG 380 at Balboa on 22 June 2018**

We refer to our discussion of 19 September 2019 and your email of 20 September 2019 attaching copies of the process issued in the proceedings that your firm has instituted in this matter before the United States District Court for the Southern District of Texas.  We thank you for the courtesy copies remitted to us but confirm that this does not constitute and is no substitute for the required official service of process on the named Defendant, Kamca Trading SA, in Fribourg.  From what we have seen from this documentation and the enquiries that we have made with the Defendant's registered office in Fribourg, there are a plethora of problems with the steps that you have taken up to now, namely:

1.  **Service has not been effected on the Defendant** – We have seen from our enquiries that the cantonal authorities in Fribourg remitted the process and service pack not to Kamca Trading SA as directed but to Kamca Holding SA, and that the latter's signatory, who signed for the latter, had no authority to sign for the former.  This is perfectly clear from the postal receipt that accompanied the certificate of service, which names the addressee as "*Kamca Holding SA*" and shows that the service pack was remitted from Kamca's place of incorporation in Fribourg to Bulle for delivery to ATEP Legal & Tax SA, who signed for receipt for Kamca Holding SA, but which neither purported to receive nor had authority to receive service of process for Kamca Trading SA (copies attached).

    This is also reflected in the certificate of service issued by the cantonal authorities which records that the documents have been delivered to the "addressee" who accepted them and goes on to state that the person who received them was "*Kamca Holding SA*" (copy attached).  The text fails to purport to provide the prescribed information as to the relationship between Kamca Trading SA and Kamca Holding SA.  The cantonal authorities have officially recognised this failure and have also written to the recipient of the process confirming that the process was mis-delivered to it and apologising (copy attached with translation).

    It is clear that the cantonal authorities in Fribourg have purported to serve the process on the wrong company and that, in consequence, the certificate of service issued by them is invalid as proof of service on Kamca Tading SA.

2.  **Service could not be effected on the Defendant** – Service of the service pack was purportedly made under the Hague Convention on the Service Abroad of Judicial and

STURZENEGGER & CO LLC

To:  Holman Fenwick Willan USA LLP          28 September 2019          2.

Extrajudicial Documents in Civil and Commercial Matters (20 UST 361; TIAS 6638). The Convention as ratified by Switzerland provides with respect to Article 5, third paragraph that legal process cannot officially be served on a Swiss entity in accordance with Article 5, first paragraph, unless it is in the language of the authority addressed or accompanied by a translation into one of those languages. In the case of Fribourg, this could be either French or German. We have now obtained a copy of the service pack that was delivered to Kamca Holding SA and have seen that none of the voluminous material apart from the "*Request for Service Abroad*" is accompanied by a translation into French. This is, therefore, a clear failure to comply with the Swiss requirements for service under the applicable Hague Convention, with the consequence, that the service pack is not in a form permitting of service on Kamca Trading SA in Fribourg.

3.  **Service of the original Complaint has been superseded by issuance of the Amended Complaint** – We have observed that the original complaint dated 21 June 2019 was amended on 4 September 2019. From our researches, we have concluded that the general rule is that the filing of the Amended Complaint supersedes the effect of the original Complaint and renders it a nullity. The filing of the purported Return of Service was made on 19 September 2019 after issuance of the amended Complaint. It would, therefore, appear that you have informed the court of the purported service of the original complaint after it had been amended but was unserved. As we indicated in our exchange of 20 September 2019, the Amended Complaint will need to be processed for proper service in Fribourg.

4.  **The proceedings in respect of the original Complaint have been notified out of time and are time barred** – We have reviewed the file since the time of the original notification by your firm of the claims asserted on behalf of the Plaintiff which was entitled "Notice of Claims for Defective Bunker" dated 13 August 2018. This involved a written response by Kamca to your firm dated 15 August 2018, in which reference was expressly made to the fact that the claim was communicated out of time pursuant to the Kamca General Terms and Conditions of Sale (Clause 10.3) which provides for a notice period for quality claims of 21 day from the date of delivery, being in this case at Balboa anchorage on 21-22 June 2018. Kamca enclosed a copy of the Kamca General Terms and Conditions of Sale. There was no response to that message.

5.  **The proceedings in respect of the original Complaint have been filed in a non-contractual jurisdiction** – We note from subsequent exchanges that your firm directed a request to Kamca dated 24 November 2018 that Kamca de-bunker the remaining fuel as delivered to the vessel and buy it back. Without prejudice to its contention that the product was in conformity with its contractual specification, Kamca communicated its readiness as a commercial gesture to buy the remaining product back when the vessel next returned to Panama or to the ports of Cartagena and Buenaventura in Colombia. However, this offer was not taken up by your clients. In response, Kamca was informed that the vessel owners planned to de-bunker the product at Fangcheng, but then did not do so and your firm again approached Kamca on 9 January 2019 seeking a further de-bunkering proposal. This was offered but was again not taken up by your clients.

Instead, Kamca found itself confronted with a Complaint issued on 21 June 2019 out of the United States District Court for the Southern District of Texas. After this came to Kamca's attention, our firm wrote to your firm by letter dated 8 July 2019 in which we expressed our surprise that your firm should take action to file a complaint in a non-

**STURZENEGGER & CO LLC**

To:   Holman Fenwick Willan USA LLP                 28 September 2019                 3.

contractual forum, and expressly pointed to Clause 10.12 of the Kamca General Terms and Conditions of Sale dealing with claims for quality, which provides:

> "*Such litigation may only be brought, exclusively, in the United States District Court for the Southern District of New York*".

We also noted our view that the proceedings brought by your clients against Kamca were seen to be premature in view of the absence of any finding of liability against our client in the London arbitration reference in which your clients had been joined, and that in view of this, Kamca would be willing to consider entering into a stand-still agreement with your clients.   By email dated 7 August 2019 you replied expressing your view that this proposal was "*premature*", and that it would be "*beneficial for all concerned to proceed with the lawsuit in Houston*".   Despite the objection expressed by us to your clients' proceedings in this non-contractual forum, your firm has pressed ahead with them anyway with no attempt to justify the action taken to institute proceedings in that forum. Since they have not been properly served after having been issued, this is all the more objectionable.

It is not our client's view that it is in any manner "beneficial" to be confronted with proceedings in a non-contractual and non-approved forum, or for any proceedings to be pursued at this point in time in view of the absence of any finding of liability against your client.   In light of this, we again state our client's proposal for a stand-still agreement, failing agreement on this and, in view of the actions that your firm has taken without consideration for the agreed forum, our client will contest the validity of service of the complaint and of the Return of Service filed on 19 September 2019, as well as the jurisdiction of the United States District Court for the Southern District of Texas out of which that process has been issued.

We reserve all our client's rights in respect of these actions by your clients.

Yours faithfully,
**STURZENEGGER & CO LLC**

Marc Sturzenegger

Attach./